NUMBER 13-05-035-CV

 

                         COURT OF APPEALS

 

               THIRTEENTH DISTRICT OF TEXAS

 

                  CORPUS CHRISTI - EDINBURG

 

 

 

DAVID JENKINS AND
CINDY JENKINS, 

INDIVIDUALLY AND ON
BEHALF OF ALL 

PERSONS SIMILARLY SITUATED,                              Appellants,

 

                                           v.

 

ENTERGY CORPORATION, 

ENTERGY SERVICES,
INC., 

ENTERGY POWER INC., 

AND ENTERGY POWER 

MARKETING CORPORATION,                                     Appellees.

 

 

 

                  On appeal from the 344th
District Court

                          of Chambers
County, Texas.

 

 

 

                              O P I N I O N

 

                     Before Justices Hinojosa, Yañez, and
Castillo

                                  Opinion by Justice Castillo

 








This appeal is brought
from the trial court's decision not to strike an intervention, and from the
order of the trial court dismissing the underlying suit for lack of subject
matter jurisdiction.  In separate conclusions
of law, the trial court found that both the Federal Energy Regulatory
Commission ("FERC") and the Texas Public Utilities Commission
("PUC") have exclusive jurisdiction. 
We affirm in part, reverse in part, and remand.

I.  Background

On August 5, 2003,
appellants, David and Cindy Jenkins, individually and on behalf of all persons
similarly situated ("Jenkins"), filed a petition alleging that
appellees, Entergy Corporation, Entergy Services, Inc., Entergy Power, Inc.,
Entergy Power Marketing Corporation, Arkansas Electric Cooperative Corporation,[1]
and Entergy Arkansas, Inc. (collectively "Entergy"), had devised an
improper price-gouging scheme to sell and deliver higher-priced electrical
power to Jenkins, while rejecting and/or selling less expensive power to
off-system utilities.  

In the petition,
Jenkins identifies Entergy Gulf States, Inc. ("EGSI")[2]
as an "unnamed co-conspirator," but asserts that it is not an
indispensable party:  "It [EGSI] is
expressly not named as a party defendant, since primary jurisdiction over EGSI
lay [sic] with the Public Utilities Commission of Texas."








Entergy Corporation is
a public utilities holding company with five subsidiary companies, each of
which is a public utility.  The Entergy
companies include electric power generation, transmission and distribution systems.  The five subsidiaries operate in different
states throughout the southern United States, providing electrical service to
approximately 2.6 million retail customers. 
EGSI is the operating company serving approximately one million Texas
consumers.  Each operating company has
electric generation facilities, consisting of either nuclear, coal, natural
gas, or oil-fired generating plants. 
Power is shared and distributed under a System Agreement, to which all
Entergy companies are parties.  The
companies also purchase and sell power from each other and from non-affiliates
in the wholesale power market.  Although
each company operates its generation, transmission and distribution facilities
independently, the production, purchasing, and sale of wholesale electricity on
behalf of those companies in order to meet needs of retail and wholesale
customers are controlled centrally by Entergy Services, Inc.
("ESI").  These decisions are
made through a dispatch center located in The Woodlands, Texas.  ESI performs a monthly accounting, assigning
a portion of the total power resources used by the whole system to each
operating company, generating an "intra-system bill."  








Jenkins alleges that
Entergy and EGSI worked in concert to force excessive purchases of power by
EGSI from within the Entergy system, rather than using cheaper power generated
by non-Entergy companies, with the result that excessive prices were charged to
EGSI customers.  Jenkins complains that
low-cost power is sold in the wholesale market for a profit, while high-cost
power produced by the most inefficient systems is billed to Entergy's and
EGSI's Texas customers.  Jenkins further
alleges that the accounting system was manipulated in an improper and illegal
manner, resulting in excessive charges to retail customers between 1994 and
2000 that exceeded prevailing market prices. 
Jenkins contends that Entergy, through this pattern of theft and
conversion, realized substantial illicit profits.  Claims include breach of duty and breach of
fiduciary duty, aiding and abetting, conspiracy, and violations of the Texas
Theft Liability Act.[3]  Jenkins seeks damages, including a
disgorgement of profits and exemplary damages. 


In its original
answer, Entergy alleged that Jenkins' claims were preempted by federal
law.  On September 15, 2003, Entergy
removed the matter to federal court, urging federal question jurisdiction.  Entergy urged that the terms and conditions
of the sharing and allocation of power between the various operating companies
were controlled by a tariff, approved by and on file with the Federal Energy
Regulatory Commission ("FERC"). 
Although Jenkins' claims were couched in terms of state torts, Entergy
urged that in reality all involved alleged violations of federal law and
questions of the reasonableness of the tariff under federal law.  








On January 29, 2004,
the federal court remanded the matter to the state trial court.  The order notes that Jenkins had opted not to
plead federal claims and invoked no federal law in his complaint.  Therefore, in order to fall within federal
question jurisdiction, Entergy, who bore the burden on removal, had to satisfy
a three-part test.[4]  The federal court concluded that "this
case provides no basis for federal jurisdiction since no federal right is an
essential element of Plaintiffs' state-law claims."  While FERC regulates the wholesale of
electricity in interstate commerce, none of Jenkins' claims were dependent upon
the violation of a federal tariff. 
Jenkins could conceivably prove his claims by providing evidence of
fraudulent accounting techniques used to overcharge customers.  The federal tariff is "not an essential
element to any of Plaintiffs' claims," and it "is well settled law
that a case cannot be removed on the basis of a federal defense."  The federal court determined that, whether or
not the Entergy System Agreement governs the behavior of the parties, it
provided no basis for removal jurisdiction. 
The federal court concluded it had no subject matter jurisdiction in the
case.

On April 23, 2004,
EGSI filed a petition in intervention, asserting that all of Jenkins'
allegations involved prices paid by EGSI to other Entergy defendants and prices
paid by EGSI customers for retail electricity. 
Further, all of the proposed class consisted solely of EGSI
customers.  EGSI urged that it therefore
had a justiciable interest in the suit. 
That same day, the Entergy defendants (now including EGSI) filed a
motion to dismiss for want of jurisdiction, urging that jurisdiction of the
trial court was preempted by FERC, and by the Texas Public Utilities Commission
("PUC"), which governs retail rates for power sold to Texas
consumers.  Entergy pointed out that
Jenkins had acknowledged that (1) EGSI's purchases from the Entergy system were
based upon FERC "approved rate formulas and tariffs," and (2) EGSI's
retail rates and services are subject to the jurisdiction of the PUC.  








Jenkins moved to
strike the intervention of EGSI, arguing that EGSI was an
"interloper," seeking neither to secure affirmative relief nor to
defeat any attempt to recover from it. 
Jenkins urged that EGSI had no justiciable interest in the suit and
that, as a joint-tortfeasor, it had no right to intervene for the purpose of
defeating a recovery against a named defendant. 
Following a hearing held June 1, 2004, the trial court issued an order
on June 15, 2004, denying the motion to strike the intervention. 








Jenkins also opposed
Entergy's motion to dismiss, urging that FERC law and regulations did not
preempt the state court's jurisdiction. 
Extensive briefing was provided by both parties; on October 5, 2004, a
hearing was held on the motion to dismiss for want of jurisdiction.  On November 24, 2004, the trial court entered
a "Final Judgment of Dismissal," finding that it lacked
subject-matter jurisdiction to proceed. 
Findings of fact and conclusions of law were entered on December 17,
2004.  They reflect the court considered
the briefing and argument of the parties, as well as submitted affidavits.[5]  The trial court determined there were no
contested issues of fact for the court to find. 
Conclusions of law include the following:  (1) Jenkins' causes of action all addressed
matters governed by the System Agreement, a tariff filed with and accepted by
FERC; (2) asserted damages are the difference between the price paid by Jenkins
for electric service from EGSI and the price Jenkins would have paid if
available lower-priced power had been allocated to EGSI; (3) under the Federal
Power Act, FERC possesses exclusive jurisdiction over federal electric tariffs
and court proceedings complaining of actions taken and decisions made under
approved federal tariffs are preempted; (4) the amount paid by Jenkins and
other retail customers of EGSI for electrical service in Texas is within the
exclusive jurisdiction of the Texas PUC; and (5) because the acts and decisions
complained of fall within the exclusive jurisdiction of FERC and the relief
sought lies within the exclusive jurisdiction of the PUC, the trial court lacks
subject matter jurisdiction over the matter. 


II.  The Agreement and the Transactions in Issue

The System Agreement
is a federal tariff, approved and regulated by FERC.  It applies an approved rate structure to
regulate wholesale prices for electric power.[6]  The System Agreement networks a system of
companies by which the following is accomplished:  (1) power generated by each participating
company may be exchanged among system participants or sold to outside systems;
(2) power may be purchased from off-system entities; and (3) a system
operations center is created to (a) determine the most effective scheduling of
sources for reliable supply of power and energy on an economical basis, (b)
determine availability of energy for purchase from or sale to outside systems,
(c) supervise and operate an economic system dispatch center, and (d) determine
billing information and conduct accounting functions.[7]  








The decisions
associated with these aspects of the System Agreement are at the heart of
Jenkins' suit.  Jenkins does not directly
challenge either the rate structure or the FERC-approved formulas that permit
recovery of costs by the operating companies participating in the System
Agreement.  Instead, Jenkins states that
he challenges the purchasing decisions by which the costs were incurred in the
first place, complaining about allegedly excessive purchases of power from the
expensive resources of the Entergy-system pool, rather than from cheaper
off-system sources when that power is available.  

ESI and/or EPMC
dispatches the generating units of the Operating Companies and purchases power
from non-affiliates in the wholesale power market in order to meet the energy
needs of Defendants' and EGSI's customers . . . .  ESI and/or EPMC has also sold to off-system
buyers . . . [manipulating] the processes by which it decides whether to
dispatch the System's generating units or purchase power off-system.[8]


 

Jenkins challenges
these decisions because they allegedly resulted in the use of the more
expensive power to service EGSI customers, thereby burdening them with higher
costs for electrical service. 








The
System Agreement includes a Schedule MSS-3, which addresses the exchange of
electric energy among the companies.  Its
purpose is to "provide the method of pricing energy exchanged among the
Companies."  It provides that
"energy from the lowest cost source available shall be allocated pursuant
to certain priorities;" "energy used to supply others will be
provided in accord with rate schedules on file with [FERC]."  Energy produced by generating units for
system energy requirements are allocated in an explicit priority sequence.  Energy received by any company from either
its own generation or from some other source can be pooled, distributed from a
joint account, and allocated by the central dispatch center to one or more
participating companies or to the company generating the power or making the
purchase.  The System Agreement provides
for many of these decisions to be made at the discretion of the operating
committee.  However, payments for energy
supplied and allocated are determined according to express formulas.  

III.  Issues on Appeal

Jenkins
raises four issues on appeal to determine whether  (1) the PUC has exclusive or primary
jurisdiction over the matter, (2) FERC has exclusive, preemptive jurisdiction
over the matter, (3) the trial court erred in dismissing the matter for lack of
subject matter jurisdiction, and (4) the trial court erred in failing to strike
the intervention of EGSI.  The issues, as
framed, directly challenge each of the conclusions of law of the trial court.

IV.  Standard of Review








Jenkins'
first three issues challenge the trial court's conclusions that it lacked
subject matter jurisdiction over the suit. 
Primary jurisdiction questions are questions of law.  Subaru of Am. v. David McDavid Nissan, Inc.,
84 S.W.3d 212, 222 (Tex. 2002) (citing Cash Am. Int'l, Inc. v. Bennett,
35 S.W.3d 12, 19 (Tex. 2000)). 
Determining if an agency has exclusive jurisdiction requires statutory
construction and raises jurisdictional issues. 
In re Entergy Corp., 142 S.W.2d 316, 321 (Tex. 2004); Subaru,
84 S.W.3d at 222.  Thus, whether an
agency has exclusive jurisdiction is a question of law we review de novo.  Subaru, 84 S.W.3d at 222 (citing El
Paso Natural Gas Co. v. Minco Oil & Gas, Inc., 8 S.W.3d 309, 312 (Tex.
1999); Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 928 (Tex.
1998)).  

The plaintiff bears the
burden of alleging facts affirmatively demonstrating the trial court's
jurisdiction to hear a case.  Tex.
Ass'n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993); Mission
Consol. Indep. Sch. Dist. v. Flores, 39 S.W.3d 674, 676 (Tex. App.BCorpus Christi 2001, no pet.).  A trial court must not weigh the merits of
the case, but instead consider only the pleadings and evidence pertinent to the
jurisdictional question.  County of
Cameron v. Brown, 80 S.W.3d 549, 554-55 (Tex. 2002) (citing Tex. Natural
Res. Conservation Comm'n v. White, 46 S.W.3d 864, 868 (Tex. 2001)).  In doing so, the trial court must construe
the plaintiff's pleadings liberally in favor of jurisdiction, Peek v. Equip.
Serv. Co., 779 S.W.2d 802, 804 (Tex. 1989), and must take all factual
allegations pled as true, unless the defendant pleads and proves that the
allegations were fraudulently made in order to confer jurisdiction.  Cont'l Coffee Prods. Co. v.
Cazarez, 937 S.W.2d 444, 449 (Tex. 1996). 
On appeal, we similarly consider the facts alleged by the plaintiff and,
to the extent it is relevant to the jurisdictional issue, the evidence
submitted by the parties.  White,
46 S.W.3d at 868.  We must construe the
pleadings in the plaintiff's favor and look to the pleader's intent.  Brown, 80 S.W.3d at 545-55.  Our task is not to determine the merits of
the case but rather to examine the petition, taking as true the facts pled, and
determine whether those facts support jurisdiction in the trial court.  Baston v. City of Port Isabel, 49
S.W.3d 425, 427-28 (Tex. App.BCorpus Christi 2001, pet. denied).








With
respect to Jenkins' fourth issue, we review a trial court's determination as to
whether an intervention should be stricken for abuse of discretion.  Liberty Nat'l Fire Ins. Co. v. Akin, 927
S.W.2d 627, 629 (Tex. 1996); Guar. Fed. Savs. Bank. v. Horseshoe Operating
Co., 793 S.W.2d 652, 657 (Tex. 1990). 
The test for abuse of discretion is whether the trial court acted
without reference to any guiding rules and principles.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241 (Tex. 1985).  The
exercise of discretion is within the sole province of the trial court, and an
appellate court may not substitute its discretion for that of the trial
judge.  Johnson v. Fourth Court of
Appeals, 700 S.W.2d 916, 918 (Tex. 1985) (orig. proceeding).  Rather, an abuse of discretion occurs only
when the trial court reaches a decision that is "so arbitrary and
unreasonable as to amount to a clear and prejudicial error of law."  Id. at 917. 

V.  Analysis

A.  The Role of EGSI in the Suit

Jenkins
contends that EGSI was deliberately not named as a defendant in the underlying
suit because primary jurisdiction over EGSI lies with the PUC.  Jenkins further contends that the prudence of
EGSI's actions was not before the court, as the claims were articulated in
Jenkins' pleadings.  Instead, Jenkins
characterizes EGSI as an "interloper," who intervened solely to
complicate the jurisdictional issues in the case.  








However,
this argument is problematic.  Although
the Entergy company ESI centrally controls allocation and discretionary
decisions, operates the dispatch center in The Woodlands, Texas, and prepares
the monthly accountings, it is not the sole object of Jenkins' petition.  Jenkins' pleadings in fact include
accusations that Entergy (including ESI) and EGSI acted in concert, in a
conspiracy:  

ESI, under the
direction of or with the knowledge and/or consent of the other Defendants and
EGSI, has manipulated the processes by which it decides whether to dispatch the
System's generating units or purchase power off-system. . . .  Defendants and EGSI, directly and/or
indirectly, have actively participated with the other Defendants and EGSI in
one or more improper and illegal schemes . . . .  Defendants' and EGSI's after-the-fact
accounting methods and computer programs have hidden and encouraged the
improper purchasing decisions . . . . 
Defendants and EGSI have worked in concert in implementing the methods .
. .  Defendants and EGSI, directly and/or
indirectly, charged customers 22% more than the prevailing market prices . . .
[generating] vast and illegal revenues for Defendants' and EGSI's Entergy
affiliates . . . .[9]

 

Defendants and EGSI
are alleged to have jointly charged Jenkins for power secured at a higher cost
than was obtainable on wholesale markets, intentionally or negligently failed
to procure readily available supplies of electric power from non-affiliates,
and  converted profits realized for
Entergy's and EGSI's use and benefit. 
EGSI is directly alleged to have participated in the same wrongdoing as
the other named defendants; it is simply not named in the suit.

We
conclude, from reading Jenkins' petition, that Jenkins' petition complains of
wrongdoing by both Entergy and EGSI. 
Rather than being peripheral, EGSI is alleged to have been a full
partner, co-conspirator, and co-tortfeasor in what is termed the illegal
scheme.  We therefore conclude that the
prudence of EGSI's actions was in fact directly before the trial court by virtue
of Jenkins' pleadings.  

 








B.  The Intervention

EGSI,
not named as a party defendant, chose to intervene in the suit pursuant to rule
60 of the rules of civil procedure.  Tex. R. Civ. P. 60.  A person or entity has the right to intervene
if it could have brought the same action, or any part thereof, in his own name,
or, if the action had been brought against him he would be able to defeat
recovery, or some part thereof.  Guar.
Fed. Savs. Bank, 793 S.W.2d at 657. 
No permission is required to intervene; the party opposing the
intervention has the burden to challenge it by a motion to strike.  Id. 
While the trial court has broad discretion to determine whether the
intervention should be stricken, it is an abuse of discretion to strike a plea
in intervention if (1) the intervenor meets the above test, (2) the
intervention will not complicate the case by an excessive multiplication of the
issues, and (3) the intervention is almost essential to effectively protect the
intervenor's interest.  Id.  








A
party seeking to intervene must show a legal or equitable interest such that he
would be entitled to recover in his own name to the extent of relief sought,
or, if he were the original defendant, he would be able to defeat recovery in
part or in whole.  Rogers v. Searle,
533 S.W.2d 440, 442 (Tex. Civ. App.BCorpus Christi  1976, no writ).  While that interest must be greater than a
mere contingent or remote interest, a party "has a justiciable interest in
a lawsuit, and thus a right to intervene, when his interests will be affected
by the litigation."  Jabri v.
Alsayyed, 145 S.W.3d 660, 672 (Tex. App.BHouston [14th Dist.] 2004, no pet.); Intermarque
Auto. Prods., Inc. v. Feldman, 31 S.W.3d 544, 549 (Tex. App.CTexarkana 2000, no
pet.).  Even where an intervenor has not
or could not have been sued directly, if a judgment for the plaintiff may lead
to an action against the intervenor or otherwise seriously prejudice the
intervenor, the intervention is necessary to assure a proper defense against
the claim.  Evan's World Travel, Inc.
v. Adams, 978 S.W.2d 225, 234 (Tex. App.BTexarkana 1998, no pet.).  The party "must have such interest in
the subject matter of litigation as makes it necessary or proper for him to
come in to the case for the preservation of that right."  Id. 








Jenkins
contends that, as an alleged joint tort-feasor, EGSI had no right to
intervene.  However, one of Jenkins'
claims alleged that EGSI was an integral part of a conspiracy scheme, actively
conceiving or condoning wrongful practices and directly participating in and
profiting from the alleged wrongs perpetrated on customers of EGSI.  While many parties are named as defendants,
the fact that EGSI is alleged to have participated in a conspiracy and to have
converted ill-gotten monies for its own direct use and benefit means that EGSI
could potentially defeat recovery under that claim, in whole or in part.[10]  We conclude that EGSI, an unnamed defendant,
had a justiciable interest in the suit. 
We further conclude that the nature of the alleged wrongdoing by all
named defendants is inextricably interwoven with the alleged wrongdoing of
EGSI, deriving from the same allegations, and that EGSI's participation in the
suit will not unduly complicate the case by a multiplication of issues.  Finally, EGSI's intervention is essential to
effectively protect some right or interest of EGSI.  See Guar. Fed. Savs. Bank, 793 S.W.2d
at 657.  EGSI's interests are potentially
adversely affected by the litigation in the event of a judgment for
Jenkins.  Jabri, 145 S.W.3d at
672; Intermarque, 31 S.W.3d at 549; Evans World Travel, 978
S.W.2d at 235.  It is undisputed that the
Entergy family of companies, including EGSI, makes purchasing, sales, and
allocation decisions centrally for the set of companies as a whole.  Any ruling in favor of Jenkins therefore will
indirectly, if not directly, impact interests and operations of EGSI; this is
further particularly true because the members of the putative class are all
direct retail customers of EGSI.

We
conclude that the trial court did not abuse its discretion in refusing to
strike the intervention of EGSI.  We
overrule Jenkins' fourth issue on appeal.

C.  The Role of the PUC and the
Statutory Scheme

The
PUC is charged with protecting the public interest in the rates and services of
electric utilities, to establish a comprehensive and adequate regulatory system
for those utilities to assure just and reasonable "rates, operations, and
services."  Tex. Const. art. V, ' 8; Tex. Util. Code Ann. ''31.001, 32.001 (Vernon
1998).  The PUC's jurisdiction is
admittedly broad, extending to issues involving the rates, operations, and
services of an electric utility.  








[T]he statutory
description of PURA[11]
as "comprehensive" demonstrates the Legislature's belief that PURA
would comprehend all or virtually all pertinent considerations involving
electric utilities operating in Texas. 
That is, PURA is intended to serve as a "pervasive regulatory
scheme" of the kind contemplated in David McDavid Nissan.[12]

 

*        *        *

The Legislature's
language demonstrates that it intended PURA to be the exclusive means of
regulating electric utilities in Texas. 
The Legislature's description of PURA as "comprehensive,"
coupled with the fact that PURA regulates even the particulars of a utility's
operations and accounting, demonstrates the statute's pervasiveness. 

 

In re Entergy Corp., 142 S.W.3d 316,
322-23 (Tex. 2004) (citations omitted).[13]  

The
PUC may allow for recovery of the reasonable costs of purchased power.  See Tex.
Util Code Ann. '' 36.203 (Vernon 1998),
36.204 (Vernon Supp.  2005), 36.205
(Vernon 1998).  In establishing and
regulating retail rates, the PUC is not precluded from reviewing and providing
adjustments for a utility's "fuel factor."  See 16 Tex. Admin. Code '' 25.236-237 (Tex.
2005).  These provisions govern the
amount of dollars in expenses that a utility may recover from its retail
customers.  

D.  The Question of Exclusive
Jurisdiction of the PUC








The
parties do not dispute that the commission has exclusive jurisdiction over rate
structures, including fuel factors. 
Jenkins contends that he does not challenge any rate structure for
electrical power or any other orders of the PUC, and that the reasonableness of
the fuel and purchase power costs are not in issue.  Jenkins instead challenges decisions to
either purchase, use or sell lower-priced and higher-priced energy, not the
monies or rates involved in those purchases. 
Jenkins argues that he challenges decisions relating to wholesale
transactions, made at interstate levels that are beyond the jurisdiction of the
PUC.  Jenkins further contends that,
while the PUC retains authority to review and evaluate EGSI's purchasing
decisions, EGSI was not named as a defendant and the prudence of its actions
was not before the trial court in Jenkins' pleadings. 

We
have already determined that EGSI could properly intervene in the suit and that
the prudence of its actions were before the trial court.  We further note that all putative class
members are retail customers of EGSI.

1.  Wholesale Rates and
Interstate Commerce

Jenkins
contends the challenged decisions lie beyond the jurisdiction of the PUC,
involving matters of interstate commerce. 
The Entergy system cuts across several state lines, and involves
transactions between multiple jurisdictions, in interstate commerce:

[The Entergy Operating
Companies] approach power planning on a systemwide basis, whereby the
individual companies' needs are the component parts of the system's power plan
[and] implementation of the System plan . . . require[s] that the individual
companies' needs be subsumed by the greater interests of the entire System.

 

Miss. Power &
Light Co. v. Miss., 487 U.S. 354, 376 (1988).  








A
state utility regulatory commission has the jurisdiction to regulate all
in-state sales of the utility to consumers. 
See Ark. Elec. Coop. Corp. v. Ark. Pub Serv. Comm'n, 461 U.S. 375,
394-95 (1983) (holding states have an interest in regulating retail
sales).  However, the line under the
Federal Power Act is clear, cutting "sharply and cleanly between sales for
resale and direct sales for consumptive uses."  Id. at 380 (concluding that a utility
receiving some of its power from out-of-state is subject to federal and not
state regulation in its sales of electricity to a municipality that resold the
bulk of the power to others).[14]  Clearly, wholesale rates are subject
exclusively to federal regulation.  Id.
at 380.  "FERC has exclusive
authority to determine the reasonableness of wholesale rates."  Miss. Power & Light, 487 U.S. at
371.  States may not alter FERC‑ordered
allocations of power by substituting their own determinations of what would be
just and fair.  Id. 

FERC‑mandated
allocations of power are similarly binding on the States, and States must treat
those allocations as fair and reasonable when determining retail rates."  Id. 


States may not alter
FERC‑ordered allocations of power by substituting their own
determinations of what would be just and fair. . . .  When FERC sets a rate between a seller of
power and a wholesaler‑as‑buyer, a State may not exercise its
undoubted jurisdiction over retail sales to prevent the wholesaler‑as‑seller
from recovering the costs of paying the FERC‑approved rate. 

 

Id. at 371-72.  








Nor
may states review "the prudence of a purchaser's participation in an
integrated operating arrangement involving wholesale and retail transmissions
between pool members."  Gulf
States Utils. Co. v. Pub. Utils. Comm'n, 841 S.W.2d 459, 467 (Tex. App.BAustin 1992, writ
denied).  However, this is not a rate
case; this dispute instead deals with the decisions at a wholesale, inter-state
level to use either system-generated higher-cost energy or lower-cost,
off-system-generated purchased power. 

2.  Exclusive Jurisdiction as
opposed to Primary Jurisdiction

Jenkins
also urges that jurisdiction of the PUC will not attach because the remedy
sought is not available through the PUC. 
This is a question of primary jurisdiction, which operates to allocate
power between courts and agencies when both have authority to make initial
determinations in a dispute.  Subaru,
84 S.W.3d at 221.  Texas courts have in
the past confused the primary jurisdiction and exclusive jurisdiction
doctrines, which are distinctly different and have different consequences when
applied.  Id. at 220.  Despite similar terminology, primary
jurisdiction is prudential whereas exclusive jurisdiction is
jurisdictional.  Id. (citing Shell
Pipeline Corp. v. Coastal States Trading, Inc., 788 S.W.2d 837, 842 (Tex.
App.BHouston [1st Dist.]
1990, writ denied)).  Trial courts should
allow an administrative agency to initially decide an issue when (1) an agency
is typically staffed with experts trained in handling the complex problems in
the agency's purview, and (2) great benefit is derived from an agency's uniform
interpretation of its laws, rules, and regulations.  








When
an action is inherently judicial in nature, the courts will retain jurisdiction
to determine the controversy unless the legislature by valid statute has
expressly granted exclusive jurisdiction to the administrative body.  Amarillo Oil Co. v. Energy-Agri Products,
Inc., 794 S.W.2d 20, 26 (Tex. 1990) (concluding that a suit to enjoin
trespass by "sand fracking" could proceed in a judicial forum); see
also Foree v. Crown Petroleum Corp., 431 SW.2d 312, 316 (Tex. 1968)
(finding that courts have jurisdiction when the commission in issue is
powerless to grant the relief sought). 
Absent such an exclusive grant, inherently judicial matters (such as a
suit for damages under the Deceptive Trade Practices Act) remain within the
jurisdiction of the courts.  Southwestern
Bell Tel. Co. v. Nash, 586 S.W.2d 647, 649-50 (Tex. Civ. App.BAustin 1979, no
writ).  Further, where the administrative
agency is powerless to grant the relief sought and has no authority to make
incidental findings which are essential to the granting of the relief, the
doctrine does not apply.  Id.  While the Legislature has conferred exclusive
original jurisdiction upon the Public Utilities Commission over the business
and property of utilities in this state for the purpose of regulating rates,
operations, and services,

. . . we hold that
jurisdiction over this tort claim against a telephone company has not been thus
removed from the courts.  Where the claim
is not for future compliance but for damages based on past acts, the exhaustion
of administrative remedies doctrine may not apply.  The notion is based on the absence of a statute
authorizing the Public Utility Commission to fix or adjudicate claims for
damages.

 








Id. at 650; see also
Henderson v. Cent. Power & Light, 977 S.W.2d 439, 447 (Tex. App.BCorpus Christi 1998,
writ denied) (holding a cause of action for DTPA violations was not abrogated
by the tariff, the document listing a public utility's services and the rates
for those services); Dolenz v. Southwestern Bell Tel. Co., 730 S.W.2d
44, 45 (Tex. App.BHouston [14th Dist.]
1987, no writ) (holding that jurisdiction over tort claims against a telephone
company has not been removed from the courts). 


3.  Conclusion as to PUC

With
respect to Jenkins' first issue, we conclude that the PUC does not have
exclusive jurisdiction over this matter. 
The retail rate structure is not the object of Jenkins' pleadings, and
the PUC cannot consider purchasing, selling or allocation decisions involving
wholesale power sales where those decisions are made on an interstate basis
between various companies.  The federal
power act, by limiting federal regulation of transmitting electric energy in
interstate commerce to those matters which are not subject to regulation by
states, does not preserve "exclusive state regulation of wholesale
hydroelectric sales across state borders." 
See United States v. Pub. Utils. Comm'n, 345 U.S. 295, 310 (1953)
(citing 16 U.S.C. ' 824(a)).  State power does not extend to an interstate
sale "in wholesale quantities, not to consumers, but to distributing
companies for resale to consumers." 
Id. at 303 (citing Pub. Utils. Comm'n v. Attleboro Steam &
Elec. Co., 273 U.S. 83, 89 (1927)).

Additionally,
the suit before us is inherently judicial in nature, in which Jenkins brings
state law tort claims based on those interstate purchasing and allocation
decisions.  We therefore conclude that
the jurisdiction of the PUC is not primary in this instance.  We sustain Jenkins' first issue on
appeal.  

E.  FERC Jurisdiction and
Preemption








The
trial court below also determined that FERC has exclusive jurisdiction over the
matters complained of in this suit. 
There is no dispute that FERC governs the Entergy System Agreement, the
federal tariff pursuant to which the challenged decisions are made.  Indeed, Jenkins concedes that the matters in
issue fall within potential FERC jurisdiction, but not within its exclusive
jurisdiction.  Entergy contends FERC
jurisdiction is exclusive, despite the federal court's order of remand.[15]

1.  The Reach of FERC's
Exclusive Jurisdiction

Congress
chose to regulate the interstate sale of electricity through the wholesale
rates that utility companies are permitted to charge.  See 16 U.S.C. '' 824, 824d; Official
Comm. of Unsecured Creditors of Mirant Corp. v. Potomac Elec. Power Co.,
378 F.3d 511, 518 (5th Cir. 2004). 
Although utility companies determine electricity rates through private
contract negotiations, those rates must be filed with FERC and certified as
"just and reasonable" to be lawful under the Federal Power Act.  16 U.S.C. ' 824d(a), (c); Potomac, 378 F.3d at 518.  FERC has the "exclusive authority to
determine the reasonableness of wholesale [electricity] rates" under the
Federal Power Act.  Potomac, 378
F.3d at 518 (citing Miss. Power & Light, 487 U.S. at 371).  That authority led to the development of the
filed rate doctrine, which states that a utility's "right to a reasonable
rate [under the Federal Power Act] is the right to the rate which the
Commission files or fixes, and, . . . except for review of the Commission's
orders, [a] court can assume no right to a different one on the ground that, in
its opinion, it is the only or the more reasonable one."  Id. (quoting Nantahala Power &
Light Co. v. Thornburg, 476 U.S. 953, 963‑64 (1986)).








Under
the filed rate doctrine, "the reasonableness of rates and agreements
regulated by FERC may not be collaterally attacked in state or federal
courts.  The only appropriate forum for
such a challenge is before the Commission or a court reviewing the Commission's
order."  Miss. Power & Light,
487 U.S. at 375.  Consistent with that
position, the Supreme Court has held that district courts are preempted from
awarding breach of contract damage awards calculated using a rate other than
the rate filed with FERC.  Potomac;
378 F.3d at 519 (citing Ark. La. Gas Co. v. Hall, 453 U.S. 571, 584‑85
(1981)).








Many
aspects of the interstate "transmission" or "sale" of
wholesale energy pursuant to a federal tariff, and not merely matters involving
rates, fall within FERC's exclusive jurisdiction.  See Calif. ex rel. Lockyer v. Dynegy,
375 F.2d 831, 851 (9th Cir. 2004).  There
is a bright‑line distinction between wholesale sales, which fall within
FERC's plenary jurisdiction, and retail sales, over which the states exercise
jurisdiction.  Id.  Moreover, the filed rate doctrine is not
limited "to rates per se or FERC orders that deal in terms of prices or
volumes or purchases."  Id.
(citing Duke Energy Trading & Mktg., L.L.C. v. Davis, 267 F.3d 1042,
1056 (9th Cir. 2001); Nantahala, 476 U.S. at 966)).  However, Lockyer is distinguishable in
that it involved direct allegations that companies had failed to adhere to
their tariff obligations to provide reserve energy capacity, thereby rendering
the Independent System Operator[16]
incapable of maintaining the grid's stability by maintaining supply and
demand.  Thus, those allegations went
"directly to wholesale market activities" and compliance with FERC
tariff obligations; the fact that they were couched in terms of state law
claims did not defeat FERC's preemptive jurisdiction.  Id. at 852.  

Similarly,
in another case relied upon by Entergy, In re Calif. Wholesale Elec.
Antitrust Litigation, 244 F. Supp.2d 1072, 1080 (S.D. Cal. 2003), aff'd
subnom. Pub. Util. Dist. No. 1 of Snohomish County v. Dynegy Power
Mktg., Inc., 384 F.3d 756 (9th Cir. 2004), although claims were lodged in
terms of state antitrust and unfair competition laws based upon alleged conduct
in artificially inflating the price of electricity, FERC jurisdiction preempted
the suit because the rates and violations of the tariffs were directly
challenged.

Plaintiff further
alleges that it has been "forced to pay prices for electricity in excess
of rates that would have been achieved by a competitive market" . . .
[with the result of] wholesale energy being sold at prices that far exceed the
price which energy would be sold in a truly competitive market.  In relation to Plaintiffs['] UCL claim, it
alleges defendants never filed their rates . . . the result of which deprived
the public . . . of notice and information necessary to make informed decisions
about rates. 

 

Id. at 1075.  The court concluded that it, along with other
state or federal courts, was "prohibited from considering any rate other
than that filed with FERC to be the appropriate wholesale rate.  As such, the filed rate doctrine prohibits a
party from recovering damages measured by comparing the filed rate and the rate
that might have been approved absent the conduct in issue."  Id. at 1077 (citing H.J. Inc. v.
Northwestern Bell Tel. Co., 954 F.2d 485, 488 (8th Cir. 1992)).  








However,
Gulf States Utils. Co. v. Ala. Power Co., 824 F.2d 1465, 1471-74
(5th Cir. 1987), concludes that courts are not preempted from awarding breach
of contract damages based upon a theory that the breach increased the amount
that was purchased, so long as damages are calculated using the filed
rate.  Gulf States, 824 F.2d at
1472.  Courts may similarly set aside an
energy contract obtained unconscionably or by fraud without interfering with
FERC's rulemaking power, so long as that order is not based upon a theory that
the filed rate was too high.  Id.  While Gulf States recognized that
setting aside a contract "would affect the filed rates by eliminating
them," it held that the Federal Power Act does not preempt such indirect
effects.  Id. at 1472 n.9. 

Whether
FERC has exclusive jurisdiction under the Federal Power Act is therefore a
close question dependent upon what exactly is in issue.  Here, Jenkins does not bring a breach of
contract claim; he does not allege fraud. 
Instead, he brings claims related to implementation of the System
Agreement, the purchases and sale of power under it, and the prudence of those
or other discretionary decisions that allegedly burden EGSI customers with
higher-priced power, albeit at regulatory-approved rates.  Jenkins asserts that the "choice not to
purchase lower-cost power available from non-affiliates falls to the discretion
of the Operating Companies," and that not all discretionary decisions are
subject to FERC's exclusive jurisdiction. 


2.  Discretionary Decisions








It
is clear that FERC jurisdiction is not exclusive or preemptive in all
circumstances.  See FERC Order No.
888-B, 81 F.E.R.C. & 61,248 at 61,018
(1997) ("[I]t is likewise clear that the Commission's jurisdiction to
consider disputes arising under jurisdictional tariffs does not as a matter of
law preclude state courts from also entertaining such disputes in the
appropriate circumstances."). Such decisions are guided by Ark. La. Gas
Co. v. Hall, 7 F.E.R.C. & 61,175 at 61,321
(1979), in which FERC stated that its assertion of jurisdiction depends upon
three factors:  (1) whether FERC has some
special expertise that would make it the appropriate forum, (2) whether there
is a need for uniformity in interpretation of the type of questions raised, and
(3) whether the case is important in relation to the regulatory
responsibilities of FERC.  Id. at
61,322.  In Hall, FERC
determined that it had no special expertise in deciding non-technical
questions, that there was no need for uniformity in interpreting terms defined
by individual contracts, and that the matter did not impact FERC regulatory
responsibilities.  Id. at
61,323.  FERC had no reason to preempt
jurisdiction of the Louisiana court.  

In
Entergy La., Inc. v. La. Pub. Serv. Comm'n, 539 U.S. 39 (2003), the
United States Supreme Court took under consideration the System Agreement
involving the same family of companies as involved in this matter.  That decision focuses on whether challenges
could be raised to allocations of costs relating to non-operating generation
units, and involved application of Schedule MSS-1 to the System Agreement.  Id. at 41. 

The
court in Entergy La. determined that "[w]here, as here, public
utilities share capacity, the allocation of costs of maintaining capacity and
generating power constitutes the sale of electric energy at wholesale in
interstate commerce."  Id. 








The filed rate
doctrine requires that interstate power rates filed with FERC or fixed by FERC
must be given binding effect. . . . In Nantahala and MP & L,
the Court applied the filed rate doctrine to hold that FERC-mandated cost
allocations could not be second guessed by state regulators.[17]

.         .         .         

The amended system
agreement differs from the tariffs in MP & L and Nantahala
because it leaves the classification of ERS units to the discretion of the
operating committee, whereas in Nantahala and MP & L the cost
allocations were specific mandates.  The
Louisiana Supreme Court concluded that this delegated discretion provided room
for the LPSC's finding of imprudence. 
However, . . . [w]e see no reason to create an exception to the filed
rate doctrine for tariffs of this type that would substantially limit FERC's
flexibility in approving cost allocation arrangements.  It matters not whether FERC has spoken to the
precise classification of ERS units, but only whether the FERC tariff dictates
how and by whom that classification should be made.  Because the amended system agreement clearly
does so, . . . second-guessing of the classification here is pre-empted.  

 

Id. at 49-50.  

Clearly,
FERC-mandated allocations cannot be challenged except before FERC, and neither
can discretionary decisions that would impact or impair FERC's flexibility in
approving cost-allocation arrangements. 
The court therefore found the Louisiana Public Service Commission could
not challenge as imprudent certain decisions made pursuant to the Entergy
System Agreement, even though they fell within the limited discretion of the
operating committee.  Id. at 49. 








In
Gulf States, 824 F.2d at 1471, however, questions arose relating to the amounts
of power purchased, with the court determining that decisions relating to
quantities or amounts of power purchased are not preempted by the Federal Power
Act.  "While the FERC has exclusive
[jurisdiction] over rates, it does not have jurisdiction over quantities except
as quantities may affect rates."  Id.  Similarly, FERC has noted with respect to
its own jurisdiction:

[Atlantic City
Electric Company], the [Public Advocate of New Jersey] and the [New Jersey
Board of Public Utilities] . . . argue that the Commission did not consider the
Board's findings that the Susquehanna power was unneeded and that the purchase
was uneconomic. . . .  [They] do not
argue that PP&L's rates are excessive, but that the purchase is uneconomic
from [Atlantic City Electric Company's] point of view.  We do not view our responsibilities under
the Federal Power Act as including a determination that the purchaser has
purchased wisely or has made the best deal available. 

 

Pa. Power and Light
Co.,
23 F.E.R.C. & 62,325 at 61,716
(1983) (emphasis added).  "[FERC]
has consistently recognized that wholesale ratemaking does not, as a general
matter, determine whether a purchaser has prudently chosen from among available
supply options."  Cent. Vt. Pub.
Serv. Corp., 84 F.E.R.C. & 61,194 at 61,975
(1998) (citing Pa. Power and Light Co., 23 F.E.R.C. & 62,325 at
61,716).  That is exactly what appears to
be in issue here.  








Entergy
urges, nevertheless, that the purchases and allotments challenged by Jenkins,
involving transactions between the companies that are parties to the System
Agreement, necessarily involve FERC mandated purchases.  We have already acknowledged that if a
purchaser has no legal right to refuse to buy that power, or no legal choice
but to make a particular purchase, FERC jurisdiction will apply.  See Cent. Vt. Pub. Serv. Corp., 84
F.E.R.C. & 61,194 at
61,975.  Entergy relies on Middle
South Energy, Inc.,[18]
31 F.E.R.C. & 61,305 at 61,661
(1985), for the proposition that EGSI's purchases are mandatory.  That decision found no incentive structure
existed between the parties to the System Agreement because "the
interchange transactions are wholly within the integrated System, are centrally
dispatched, and are mandated by MSS [Entergy] rather than the individual companies."  Id. 
However, the agreement reflects those interchange transactions are not
mandated by FERC, but instead are delegated to the operating committee, to
which the participating companies must defer. 
Therefore, these decisions are not "legally mandated" as contemplated
by Miss. Power & Light, 487 U.S. at 371, or Entergy La., 539
U.S. at 49-50.  We interpret the
discretionary decisions in issue as being the type that do not impact or impair
FERC's flexibility in approving cost-allocation arrangements.  Cf. Entergy La., 539 U.S. at 41. 

3.  The Question of Damages

Entergy
argues that Jenkins' damage claims place this matter within FERC's exclusive
jurisdiction.  Jenkins prays for the
"difference between the true price for power that should have been charged
Plaintiffs and the actual price charge to Plaintiffs for the Entergy System
Pool power," or alternatively for a disgorgement of "ill-gotten gains
and profits earned."  








We
agree that the filed rate doctrine bars a claim that would require this Court
to measure the difference between the allegedly fixed wholesale price and an
otherwise "just and reasonable wholesale price," regardless of
whether the claim itself is couched in state law terms.  Calif. Wholesale Elec., 244 F. Supp.2d
at 1078.  We nevertheless conclude that
this is not the measure of damage pursued by Jenkins.  Cent. Vt. Pub. Serv. Corp., 84
F.E.R.C. & 61,194 at 61,975,
involved FERC's acceptance of its annual cost report filing under its RS-2
wholesale rate schedule with Connecticut Valley Electric Company.  FERC specifically made no determination as to
whether it was prudent for the purchaser to enter into a contract, or whether,
over time, it had become imprudent for the purchaser not to exercise
termination rights in order to purchase cheaper power elsewhere.  Id. 
FERC took no position on whether Connecticut Valley had other power
supply choices available, or whether it acted imprudently.  Id. 


Jenkins
does not challenge the rate structure by which claimed damages would be
calculated.  He accepts the rates for all
electricity, however acquired.  Jenkins
does not allege any textual violations of the System Agreement, or breach of
contract.  Jenkins does not challenge the
rates or the FERC-approved formulas, but instead the discretionary decisions
that directed who would benefit from the cheaper power.  Cf. La. Pub. Serv. Comm. v. Entergy Servs.,
106 F.E.R.C. & 63,012 at 65,104
(2004)[19]
(involving direct challenges to the System Agreement's cost allocation formulas
and alternative claims that the System Agreement had been violated).  








There
is a distinction between Jenkins' allegations and cases such as Calif.
Wholesale Elec., where the plaintiffs asserted that absent the power
companies' improper conduct and anti‑competitive acts, they would have
paid different "rates."  Calif.
Wholesale Elec., 255 F. Supp.2d at 1080. 
The plaintiffs in Calif. Wholesale Elec. sought as redress the
difference between the charged rates and the different, hypothetical rates they
believed would have "been achieved in a competitive market."  Id. at 1077.  Because the court would be "expressly
required to assume 'a hypothetical rate different from that actually set by
FERC,'" FERC jurisdiction prevailed.  Id. 
Such is not the case here.  

4.  The System Agreement








We
have also reviewed the portions of the System Agreement cited by Entergy for
the proposition that the agreement controls the prudence of purchases of power
by the operating committee, and therefore FERC jurisdiction is exclusive.  The cited portions of the agreement reflect
the following:  (1) the companies, with
the consent of or under conditions specified by the operating committee, may
agree to purchase capacity or energy from outside sources and if purchased by
the operating company, shall be allocated amongst the companies in any manner
mutually agreeable to them; (2) the operating committee may purchase energy
under economic dispatch or emergency conditions; (3) the operating committee is
to ensure the continuous supply or capacity of energy, provide for and
coordinate safe dispatching, the proper distribution of reserves, coordinate
negotiations for the interchange and sale of power and energy, including the
sale and delivery to others on a profitable basis of power and energy not
required for system purposes, and to secure power from external sources as may
be required or will result in savings to the companies; and (4) the operating
committee shall determine availability of energy for purchase from or sale to
outside systems in an economical manner. 


The
discretion reflected in these provisions is broad.  The fact that the operating committee has
such discretion granted in the System Agreement does not mandate that FERC
oversee each of these decisions.  Indeed,
FERC has specifically declined to consider the prudency or wisdom of a
purchaser's choices between available power supply options, or whether a
purchaser "has made the best deal available."  Pa. Power and Light Co., 23 F.E.R.C. & 62,325 at 61,716; Cent.
Vt. Pub. Serv. Corp., 84 F.E.R.C. & 61,194 at 61,975
(citing Pa. Power and Light Co., 23 F.E.R.C. & 62,325 at 61,716.[20]


We
further note the observations of the federal court in its order remanding the
case before us to state court:








None of the Texas
common law or statutory causes of action cited by Plaintiffs in their Petition
require the violation of a federal tariff. 
Conduct that violates the tariff may also violate the TTLA [Texas Theft
Liability Act] or other common-law duties, but a violation of the tariff is not
an essential element to any of Plaintiffs' claims.  Plaintiffs can conceivably prove their
state-law claims by providing evidence that Defendants used fraudulent
accounting techniques to overcharge customers. 
This type of case would not require Plaintiffs to reference the tariff
during the presentation of their case. 
This is not to say the tariff would never be mentioned in a trial of
this controversy . . . but the fact remains that the federal tariff at issue is
not an essential element to any of Plaintiffs' claims.[21]

 

We
conclude that, while FERC jurisdiction could potentially expand to encompass
this dispute, FERC does not have exclusive or preemptive jurisdiction over the
claims brought by Jenkins in this matter. 
We sustain Jenkins' contentions in his second and third issues,
concluding that FERC does not have exclusive preemptive jurisdiction over these
proceedings and that the trial court erred in dismissing the matter for lack of
subject matter jurisdiction.

Conclusion

We
make no determinations of the merits in the underlying case.  We affirm the trial court's refusal to strike
the intervention of EGSI, finding no abuse of discretion.  We reverse the trial court's order dismissing
the matter for lack of subject matter jurisdiction, and remand for further
proceedings.  

ERRLINDA CASTILLO

Justice

 

Opinion delivered and
filed 

this the 2nd day of
March, 2006.                                     











[1] Arkansas Electric Cooperative
Corporation was non-suited on March 26, 2004. 






[2] David and Cindy Jenkins are Texas
residents who receive their power through Entergy Gulf States, Inc.
("EGSI").  





[3] Tex. Civ.
Prac. & Rem.Code Ann.
'134.001, et seq. (Vernon
2005).  





[4] See Howery v. Allstate Ins. Co.,
243 F.3d 912 (5th Cir. 2001).  Howery
holds that federal question jurisdiction can exist where the complaint states a
cause of action created by state law and (1) a federal right is an essential
element of the state claim, (2) interpretation of the federal right is
necessary to resolve the case, and (3) the question of federal law is
substantial.  Id. at 917.  





[5] Objections to the affidavits were
sustained to the extent that legal conclusions were not considered.  





[6] The System Agreement calls for
centralized control of electricity purchases, operations, and dispatches
throughout the Entergy system, with the overall objective of "economic
dispatch," defined to mean obtaining "the lowest reasonable cost of
energy to all of the Companies consistent with the requirements of daily operating
generation reserve, voltage control, electrical stability, loading of
facilities and continuity of service to the customers of each Company."





[7] This listing does not encompass
all functions of the System Agreement.  





[8] See Plaintiffs' First
Amended Original Petition.  





[9] See Plaintiffs' First
Amended Original Petition. 





[10] Elements of a conspiracy claim
include (1) two or more persons, (2) an object to be accomplished, (3) a
meeting of the minds on the object or course of action, (4) one or more
unlawful, overt acts, and (5) damages as a proximate result.  Chon Tri v. J.T.T., 162 S.W.3d 552,
556 (Tex. 2005) (citing Juhl v. Airington, 936 S.W.2d 640, 644 (Tex.
1996)).  If other defendants are able to
prove they did not participate in a conspiracy, and EGSI is similarly able to
defeat any claim that it participated, no claim for conspiracy can
survive.  Further, failure to include
EGSI could potentially adversely impact EGSI by making it impossible for its
parent or affiliate to defeat such a conspiracy claim, resulting in an
indirect, if not direct, impact upon EGSI's operations and revenues.  





[11] Public Utility Regulatory Act, Tex. Util Code Ann. '11.001 et seq. (Vernon
1998). 





[12] Subaru of Am. v. David McDavid
Nissan, Inc., 84 S.W.3d 212, 221 (Tex. 2002).  





[13] In re Entergy involved an
alleged breach of a merger agreement. 
That court determined that even if the merger agreement began as a
private contract, it took on an administrative character when the parties
agreed that the merger savings would be implemented in the post-merger rate
proceedings filed with the PUC, and the agreement was the basis for the PUC's
regulatory approval of the merger. 
Therefore the PUC had exclusive jurisdiction over the dispute.  See In re Entergy Corp., 142
S.W.3d 316, 322-23 (Tex. 2004).  That
dispute is admittedly distinguishable from the situation before us. 





[14] Citing Panhandle E. Pipeline
Co. v. Pub. Serv. Comm'n of Ind., 332 U.S. 507, 517 (1947); United
States v. Pub. Utils. Comm'n of Calif., 345 U.S. 295, 308 (1953); FPC v.
S. Calif. Edison Co., 376 U.S. 205 (1964) (applying test set forth in Attleboro
Steam & Elec. Co., 273 U.S. 83 (1927)).





[15] The federal court, in declining
jurisdiction, noted:  "Even if they
could have, Plaintiffs do not allege a violation of the Federal Power Act or
any other federal law or regulation.  Nor
are they attempting to enforce a liability or duty under the Act." 

 





[16] The "Independent System
Operator" was defined as a non-profit, non‑governmental public
benefit corporation, set up to orchestrate the transmission and sale of
electricity.  Calif. ex rel. Lockyer v. Dynegy, 375 F.2d 831, 852 (9th Cir. 2004). 





[17] The state order in Nantahala
allocated more of Nantahala's purchases to low-cost power than the proportion
approved by FERC.  By requiring Nantahala
to calculate its rates as if it needed to procure less high-cost power than
under FERC's order, the state order "trapped" a portion of the costs
incurred by Nantahala and ran counter to the rationale for FERC approval of
cost allocations.  Entergy La., Inc.
v. La. Pub. Serv. Comm'n, 539 U.S. 39, 47 (2003) (citing Nantahala Power
& Light Co. v. Thornburg, 476 U.S. 953, 971 (1986)).  





[18] The Enetergy system of companies
was formerly identified as Middle South Utilities, and cases involving Middle
South Energy or related entities involve the same (or predecessor) system
agreement in issue here.  





[19] Aff'd in part and rev'd in part,111 F.E.R.C. &61,311 at 62,350 (2005).





[20] We note Entergy's argument that La.
Pub. Serv. Comm'n v.Entergy Servs. involves similar issues.  However, in that matter, the complaint went
directly to how the schedule MSS-3 formulas were being implemented, thus
challenging compliance with the FERC approved System Agreement.  See La. Pub. Serv. Comm. v. Entergy
Servs., 106 F.E.R.C. & 63,012 at 65,104 (2004).  Jenkins' claims in this matter are not so
couched. 





[21] Jenkins contends that this federal
court order should direct our decision in this matter.  However, no appropriate theories apply in the
situation before us to support that argument. 
Res judicata, also known as claim preclusion, prevents the relitigation
of a finally adjudicated claim and related matters that should have been litigated
in a prior suit.  State and County
Mut. Fire Ins. Co. v. Miller, 52 S.W.3d 693, 696 (Tex. 2001).  The "law of the case" doctrine is
the principle under which questions of law "decided on appeal to a court
of last resort" will govern the case throughout its subsequent
states."  Id.  Collateral estoppel is narrower than res
judicata, precluding only the relitigation of identical ultimate issues of fact
that have already been actually litigated and that were essential to the
judgment in a prior suit.  See
Bonniwell v. Beech Aircraft Co., 663 S.W.2d 816, 818 (Tex. 1984).  "Collateral estoppel issues concern only
whether:  (1) the facts sought to be
litigated in the second action were fully and fairly litigated in the first
action, and (2) those facts were essential to the judgment in the first
action."  Johnson & Higgins
v. Kenneco Energy, 962 S.W.2d 507, 519 (Tex. 1998).  Jenkins urges that collateral estoppel should
and can apply to a case after remand from federal court.  We need not make this determination here
inasmuch as collateral estoppel applies to fact issues, and jurisdiction is a
question of law.